UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| HUMBERTO I. MIRANDA, CDCR #AV-3793,<br><br>                      Plaintiff,<br><br>vs.<br><br>RAYMOND MADDEN, Warden; KEVIN REILLY, Health Care CEO; RAMIREZ, Correctional Officer; FLORES, Correctional Officer; NANCY ADAM, M.D.; JOHN DOE, Nurse,<br><br>                      Defendants. | Case No.: 3:19-cv-01605-LAB-RBM<br><br>**ORDER:**<br><br>**1) DISMISSING EIGHTH AMENDMENT INADEQUATE MEDICAL CARE CLAIMS AGAINST ALL DEFENDANTS PURSUANT TO 28 U.S.C. § 1915(e)(2) AND § 1915A(b)**<br><br>**AND**<br><br>**2) DIRECTING U.S. MARSHAL TO EFFECT SERVICE OF AMENDED COMPLAINT UPON DEFENDANTS MADDEN, RAMIREZ, AND FLORES PURSUANT TO 28 U.S.C. § 1915(d) AND Fed. R. Civ. P. 4(c)(3)** |

Plaintiff, Humberto I. Miranda, currently incarcerated at Pelican Bay State Prison ("PBSP") in Crescent City, California, is proceeding pro se in this civil rights action filed pursuant to 42 U.S.C. § 1983. Miranda seeks to hold both Centinela State Prison ("CEN") and PBSP correctional and medical officials liable for shoulder injuries he claims to have

sustained when part of a visiting room ceiling collapsed on him at CEN on August 22, 2015.

## I.     Procedural Background

On November 4, 2019, the Court granted Plaintiff leave to proceed in forma pauperis, conducted its initial screening of his Complaint, and dismissed it sua sponte and in its entirety for failing to state a claim pursuant to 28 U.S.C. § 1915(e)(2)(B) and § 1915A(b). *See* ECF No. 5. Plaintiff was given 45 days leave to file an amended complaint that addressed all the deficiencies of pleading the Court identified. *Id.* at 14. *See also Lopez v. Smith*, 203 F.3d 1122, 1130-31 (9th Cir. 2000) (en banc) ("[A] district court should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured.") (citations omitted)).

After Miranda requested and was granted an extension of time, on January 27, 2020, he filed his Amended Complaint ("FAC") (ECF No. 8). Miranda re-names all the same Defendants he did originally, and re-alleges both his Eighth Amendment unsafe conditions of confinement and inadequate medical care claims. *See* FAC at 23-24. He seeks declaratory relief, compensatory and punitive damages and demands a jury trial. *Id.* at 25.

## II.    Screening pursuant to 28 U.S.C. § 1915(e)(2) and § 1915A

### A.     Standard of Review

Because Plaintiff is a prisoner and is proceeding IFP, his FAC, like his original Complaint, also requires a pre-answer screening which the Court conducts *sua sponte* pursuant to 28 U.S.C. § 1915(e)(2) and § 1915A(b). As Plaintiff is now aware, under these statutes, the Court must dismiss a prisoner's IFP complaint, or any portion of it, which is frivolous, malicious, fails to state a claim, or seeks damages from defendants who are immune. *See Lopez v. Smith*, 203 F.3d 1122, 1126-27 (9th Cir. 2000) (en banc) (discussing 28 U.S.C. § 1915(e)(2)); *Rhodes v. Robinson*, 621 F.3d 1002, 1004 (9th Cir. 2010) (discussing 28 U.S.C. § 1915A(b)). "The purpose of [screening] is 'to ensure that the targets of frivolous or malicious suits need not bear the expense of responding.'"

*Nordstrom v. Ryan*, 762 F.3d 903, 920 n.1 (9th Cir. 2014) (quoting *Wheeler v. Wexford Health Sources, Inc.*, 689 F.3d 680, 681 (7th Cir. 2012)).

"The standard for determining whether a plaintiff has failed to state a claim upon which relief can be granted under § 1915(e)(2)(B)(ii) is the same as the Federal Rule of Civil Procedure 12(b)(6) standard for failure to state a claim." *Watison v. Carter*, 668 F.3d 1108, 1112 (9th Cir. 2012); *see also Wilhelm v. Rotman*, 680 F.3d 1113, 1121 (9th Cir. 2012) (noting that screening pursuant to § 1915A "incorporates the familiar standard applied in the context of failure to state a claim under Federal Rule of Civil Procedure 12(b)(6)"). Rule 12(b)(6) requires a complaint "contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted); *Wilhelm*, 680 F.3d at 1121.

Detailed factual allegations are not required, but "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678. "Determining whether a complaint states a plausible claim for relief [is] ... a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* The "mere possibility of misconduct" or "unadorned, the defendant-unlawfully-harmed me accusation[s]" fall short of meeting this plausibility standard. *Id.*; *see also Moss v. U.S. Secret Service*, 572 F.3d 962, 969 (9th Cir. 2009).

B.   Allegations in FAC

As he did previously, Plaintiff claims to have been seated at a table in CEN's Facility C visiting room with his girlfriend Veronica Adame on August 22, 2015, when "wet and heavy objects, water, and debris that smelled of mildew fell from the ceiling and struck both Plaintiff and Adame on the top of their heads, neck, back, and shoulders." *See* FAC at 13–14 ¶¶ 13–14. Plaintiff "covered Adame with his body and ushered her under the table" to seek refuge. *Id.* at 14 ¶ 15. Plaintiff and Adame then "observed an 8 ft x 8 ft hole directly above where they [had been] seated." *Id.* ¶ 16.

///

Plaintiff now claims Warden Madden was "well aware of a leak coming from the ceiling of C-Facility's visiting room," because an inmate visitor's committee reported "this and may other complaints and concerns" directly to him "at or around 30 days" before. *Id.* at 14–15 ¶¶ 19–22. Adame was a member of that committee and Plaintiff contends Madden "was present for a meeting" when the committee "notified prison officials of the leak in the ceiling and the continuing problems with the air conditioners in C-Facility['s] visiting room." *Id.* at 15, 17 ¶¶ 21, 32.

Plaintiff's amended allegations further contend Officers Ramirez and Flores "had been assigned to C-Facility visiting room for at least 90 days" before the ceiling collapsed, and that during that time the air conditioner "kept shutting do[wn]." *Id.* at 15–16 ¶¶ 24–25. Plaintiff claims the average temperature in CEN is 90°–115° during the summer. *Id.* ¶ 26. After the air conditioner was "said to be fixed, a leak began to fall in the immediate area where on August 22, 2015, the ceiling collapsed." *Id.* at 16 ¶ 27. Plaintiff claims he and Adame, and "many other inmates and visitors" notified Officers Ramirez and Flores about the leak and the possible risk of injury, but both Officers "waived it off as nonsense," and refused "to put [in] a maintenance work order to fix the leak." *Id.* at 16–17 ¶¶ 29–32. Plaintiff contends Ramirez and Flores's "refusal to address the leak to personnel in charge of maintaining the visiting room" placed him at a "substantial risk of injury from the date of the notice up to August 22, 2015," [when] the ceiling eroded[, …] became soaked with water" and "eventually collaps[ed]." *Id.* at 17 ¶ 33.

After reporting that the ceiling had collapsed on them, Plaintiff also claims Officers Ramirez and Flores laughed. *Id.* ¶ 34. Adame was escorted to the visiting room lobby and medical staff was called to "check on [her] injuries." *Id.* ¶ 35. Plaintiff also claims to have "made Defendants Ramirez and Flores aware" of his "unbearable locked right shoulder" pain and waited ten minutes before realizing they had not summoned medical aid for him. *Id.* at 17–18 ¶¶ 36–39. When he asked Ramirez and Flores for medical attention, Ramirez "sarcastically" asked if he was "serious" and both "warned …

that if they called medical, his visit would be over." *Id.* ¶ 38. Plaintiff objected that he "should not have to choose" between medical attention and "check[ing] on his girlfriend's well-being" and claims it was only after he notified Sgt. Din that Ramirez and Flores "refuse[d] to call for medical aid and about his dislocated right shoulder" that Defendant John Doe, the responding nurse, arrived and he was escorted to the inmate search area. *Id.* at 18–19 ¶¶ 42–44.

When Plaintiff reported to Doe that he was experiencing "severe pain in his right shoulder," Ramirez and Flores "began to laugh," called him a liar, and suggested that if he "was going to fake an injury he needed to point at the correct side," *i.e.*, "the one that had debri[s]." *Id.* at 19 ¶¶ 45–46. Plaintiff denied faking, claimed he could not move his right arm, was "experiencing a heavy pull and weight on his shoulder," and "attempt[ed] to raise his right arm[,] but the pain was too much." *Id.* ¶ 47. But Plaintiff contends Doe failed to examine him further, told him the pain would subside, that he would receive follow-up care in the morning, and that an "Incident Report" would be sent to medical personnel. *Id.* ¶ 48.

Plaintiff was then reunited with Adame, and the two spoke with a "top official, perhaps a Captain" about the incident. *Id.* at 19–20 ¶¶ 49–50. Plaintiff claims this unidentified official assure him he would "receive all the medical aid he needed," and that Warden Madden and Health Care CEO Reilly "were notified of the incident and w[ould] provide and assure Plaintiff and Adame … receive[d] proper medical care." *Id.* at 20 ¶ 51.

Plaintiff did not receive any follow-up medical care the day after, and claims to have been unable to sleep, work, shower, or attend meals or yard activities due to pain in his right shoulder. *Id.* ¶ 54. He claims he submitted three Health Care Service Request Forms seeking medical assistance, but received a response to only the third, dated

///
///
///

September 6, 2015.[1] *Id.* ¶ 54 & Ex. A at 29. When he was "finally seen by medical staff" on September 7 or 8, 2015, he again claims his injuries were "waived off as minor." *Id.* ¶ 55, Ex. A at 29. Plaintiff also contends to have submitted a "CDCR-22" and to have "mailed a personal letter to both Defendants Madden and Reilly" "notifying them that he had not received any follow up care," but he received no response. *Id.* at 20–21 ¶¶ 56–58.

Approximately one year later, Plaintiff was transferred to Calipatria State Prison ("CAL") and "upon arrival" admits to have received an x-ray of his right shoulder. *Id.* at 21, 33 ¶¶ 58, 61 & Ex. C. Plaintiff notified the "CAL doctor" of the incident at CEN. *Id.* at 21–22 ¶ 62. A November 22, 2016, x-ray revealed "minor degenerative changes at the acromioclavicular joint" the pattern of which might "predispose [him] to rotator cuff injury," but "[n]o acute fracture or dislocation." *Id.*, Ex. C at 33. The CAL doctor "requested physical therapy." *Id.* at 21–22 ¶ 62.[2]

From CAL, Plaintiff was transferred to Corcoran SHU, and then to PBSP, where he "was placed under the care of Defendant Nancy Adam, MD." *Id.* at 22 ¶¶ 63–64. "At this point, [in] 2018, and after three years of lack of care by prison officials, Plaintiff's right shoulder's range was very limited and his pain was severe." *Id.* ¶ 66. When he

---

[1] Plaintiff does not specify to whom these Health Care Service Request Forms were addressed, and does not claim any of the Defendants were personally responsible for responding to these requests. *See Barren v. Harrington,* 152 F.3d 1193, 1194 (9th Cir. 1998) ("A plaintiff must allege facts, not simply conclusions, t[o] show that [each defendant] was personally involved in the deprivation of his civil rights.").

[2] Plaintiff's exhibits suggest his Primary Care Provider ("PCP") at CAL was D. Hjerpe, MD. *See* Exs. C & D at 33, 35–36. Dr. Hjerpe's Medical Progress Notes dated 1/12/2017 reveal that Plaintiff reported having "pain in his right shoulder and lower back," and "occasional popping in his right shoulder" which he attributed to the ceiling collapse at CEN. *Id.* at 35. The Notes also indicate Plaintiff reported he was "able to exercise," but was "sore the next day" and that his back pain was worse than his shoulder pain. *Id.* Dr. Hjerpe also recorded Plaintiff as having a "[f]ull active range of motion in both shoulders," and a "well-developed musculature consistent with a strength based exercise program." *Id.* In addition to a physical therapy referral, Dr. Hjerpe discussed Plaintiff's history of Hep C, gave him a "handout on home exercises for his back pain" and a prescription for salsalate to address his "right shoulder and low back pain." *Id.* Dr. Hjerpe is not named as a party to this action; and Plaintiff does not appear to challenge Dr. Hjerpe's course of medical treatment while he was under his care at CAL. *See* Fed. R. Civ. P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes.").

complained to Dr. Adam, "how [much] worse his shoulder pain was," he claims Adam too "waived his injuries as minor" and "never provided a proper care plan." *Id.* at 22–23 ¶¶ 66–67. "Only after [he] submitted a prison grievance did [Dr.] Adam, without argument, request[] an MRI." *Id.* at 23 ¶ 68. The MRI showed "rotator cuff tendonitis with an abnormal high signal within the superior labrum with an adjacent para labral cyst. The findings [were] compatible with superior labral tear." *Id.* ¶ 69 & Ex. E at 38.[3]

On May 31, 2019, and after being referred to orthopedic surgeon Richard N. Cross,[4] Plaintiff underwent arthroscopic surgery on his right shoulder. *Id.* ¶ 71 & Ex. F at 40–42. He claims to have still been recovering from that surgery at the time of filing, and claims he "will not have full function of [his right shoulder] for a year, if ever," due to Defendants' "deliberate indifference" both to his safety and to his medical needs. *Id.* at 23–23, ¶¶ 71, 73–75.

C. <u>Analysis</u>

As alleged against all Defendants, the Court continues to find Plaintiff's Eighth Amendment inadequate medical care claims insufficient state a plausible claim of deliberate indifference to his serious medical needs. *See* 28 U.S.C. § 1915(e)(2)(B)(ii), § 1915A(b)(1); *Watison*, 668 F.3d at 1112; *Wilhelm*, 680 F.3d at 1121.

---

[3] The MRI Plaintiff attaches as Exhibit E lists N. Adam as the ordering physician, and is dated 12/13/18. *See* ECF No. 8 at 38. However, the Report also notes Plaintiff received a previous right shoulder x-ray on November 7, 2018, which showed rotator cuff tendonitis and "no discrete tear." *Id.* The MRI further includes reference to Plaintiff's history of right shoulder impingement and pain, as well as a "failed cortisone shot." *Id.*

[4] Plaintiff does not allege that Dr. Adam, whom he identifies as his PCP at PBSP, *see* FAC at 22, referred him for the orthopedic consult and surgery performed by Dr. Cross, nor does he name Cross as Defendant. However, Cal. Code Regs., tit. 15 § 3999.301(c), which governs outpatient specialty services provides that: "(1) The Department shall ensure access to safe and cost-effective specialty services that are medically necessary in order to establish diagnoses, make recommendations for diagnostic work-up, provide therapy, and establish treatment plans that include frequency of follow-up appointments with the Previous specialist and/or the Primary Care Provider (PCP)" *and* "(2) Specialty services *shall be ordered by PCPs* who practice within the California Department of Corrections and Rehabilitation and shall indicate the timeframe in which the service is necessary." *Id.* (emphasis added).

### 1. Inadequate Medical Care

As this Court noted in its November 4, 2019 Order, a prisoner's claim of inadequate medical care does not constitute cruel and unusual punishment unless the mistreatment rises to the level of "deliberate indifference to serious medical needs." *See* ECF No. 5 at 9–10 (citing *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006) (citing *Estelle v. Gamble*, 429 U.S. 97, 104 (1976))). The two part test for deliberate indifference requires Plaintiff to plead facts sufficient to show (1) "a 'serious medical need' by demonstrating that failure to treat [his] condition could result in further significant injury or the 'unnecessary and wanton infliction of pain,'" and that (2) "the defendant's response to the need was deliberately indifferent." *Jett*, 439 F.3d at 1096.

"Serious medical needs can relate to 'physical, dental and mental health.'" *Edmo v. Corizon, Inc.*, 935 F.3d 757, 785 (9th Cir. 2019) (quoting *Hoptowit v. Ray*, 682 F.2d 1237, 1253 (9th Cir. 1982), *abrogated on other grounds by Sandin v. Conner*, 515 U.S. 472 (1995)). But prison officials do not act in a deliberately indifferent manner unless they "know[] of and disregard[] an excessive risk to inmate health or safety." *Farmer*, 511 U.S. at 837.

While Plaintiff's amended allegations as to the seriousness of his need for immediate medical attention on August 22, 2015 continue to be sparse, the Court will again assume his initial complaints of an "unbearable" and "severe" pain, "locking," and a "heavy pull and weight on his right shoulder," *see* FAC at 18–19 ¶¶ 37, 39, 47, are sufficient to plausibly suggest he suffered from an objectively serious medical need immediately after the ceiling collapsed on him. *See Wilhelm*, 680 F.3d at 1122; *Lopez*, 203 F.3d at 1131 ("serious medical needs" include "a medical condition that significantly affects an individual's daily activities," and "the existence of chronic and substantial pain") (citation and internal quotations omitted); *cf. Gonzalez v. Runnels*, No. C 07-2303 MHP PR, 2010 WL 3629843, at *5 (N.D. Cal. Sept. 14, 2010) (finding prisoner's "occasional" complaints of shoulder pain sufficient to create triable issue of fact as to whether he suffered from an objectively serious medical condition), *aff'd*, 451 F. App'x

664 (9th Cir. 2011).

As the Court also noted in its November 4, 2019 Order, however, to support a claim of deliberate indifference, Plaintiff must allege additional facts which plausibly show the course of treatment Defendants Madden, Reilly, Ramirez, Flores, Doe, and Adams chose in response to his need, was "medically unacceptable under the circumstances," and that each "chose this course in conscious disregard of an excessive risk to … [P]laintiff's health." *Edmo*, 935 F.3d at 786 (citations omitted). "Deliberate indifference is a high legal standard," *Simmons v. Navajo Cty. Ariz.*, 609 F.3d 1011, 1019 (9th Cir. 2010); *Toguchi v. Chung*, 391 F.3d 1051, 1060 (9th Cir. 2004), is present only in cases where there was "a purposeful act or failure to respond to a prisoner's pain or possible medical need," and where that indifference caused harm. *Jett*, 439 F.3d at 1096. The alleged indifference to medical needs must also be substantial; inadequate treatment due to malpractice, or even gross negligence, does not amount to a constitutional violation. *Estelle*, 429 U.S. at 106; *Wood v. Housewright*, 900 F.2d 1332, 1334 (9th Cir. 1990).

As to Officers Flores and Ramirez, Plaintiff continues to allege only that on August 22, 2015, they did not immediately take his request to be medically evaluated seriously, and that they "began to laugh and called him a liar." *See* FAC at 19 ¶ 45. However, Plaintiff also acknowledges that as soon as Sgt. Din arrived on the scene, nurse Doe *was* summoned and he was escorted to an adjacent inmate search area, where Doe observed as he "attempted to raise his right arm," "told Plaintiff that the pain would subside," and informed him that he "would be sent to medical personnel." *Id.* at ¶¶ 47–48. None of these allegations plausibly suggest Flores, Ramirez, or Doe purposefully failed to respond to an obviously serious or emergent need for immediate medical intervention. *See Jett*, 439 F.3d at 1096.

Plaintiff also claims an unidentified Captain told him Warden Madden and Health Care CEO Reilly "were notified of the incident" and that both he and Adame would "receive proper medical care." *See* FAC at 20 ¶ 51. Plaintiff also claims to have

submitted a CDCR-22 and a "personal letter" to both Madden and Reilly to "make them aware of his serious injury," but he never received a response, and was never examined by a physician at CEN. *Id.* at 20–21 ¶¶ 56–58. These allegations alone, however, are insufficient to plausibly show either Madden or Reilly acted with a "sufficiently culpable state of mind." *Wilson v. Seiter*, 501 U.S. 294, 297 (1991) (internal quotation marks, emphasis and citations omitted). As CEN's Warden and CEO of Health Care, Madden and Reilly cannot be held liable simply because they are "legally responsible for the health care operations of CEN" and for the "welfare … of all inmates." *See* FAC at 12 ¶¶ 4–5. "Because vicarious liability is inapplicable to […] § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Iqbal*, 556 U.S. at 676. To state a claim based on their alleged deliberate indifference to his serious medical needs, Plaintiff must, but has failed to allege not only that Madden and Reilly were made "aware of the facts from which the inference could be drawn that a substantial risk of serious harm exist[ed]," but *also* that each actually "dr[e]w th[at] inference." *Farmer*, 511 U.S. at 837. This necessary subjective component of an Eighth Amendment inadequate medical care claim remains absent.

      Finally, with respect to Dr. Adam, Plaintiff alleges he complained to her on unspecified dates in 2018, three years after the ceiling incident at CEN, that he continued to experience pain in his right shoulder, that it was affecting his daily activities, and that his range had become limited. *See* FAC at 22 ¶¶ 65–67. Plaintiff makes only conclusory statements that Adam "waived [off] his injuries as minor," and that she "never provided a proper care plan." *Id.* at 66–67; *Iqbal*, 556 U.S. at 678. He further admits, however, that Dr. Adam ordered an MRI, which he received on December 13, 2018. *Id.* ¶ 68 & Ex. E at 38. What's more, the MRI Report Plaintiff submits as an exhibit shows he *had* previously received corticosteroid injections, was provided "multiple physical therapies," and was given a November 7, 2018 x–ray—all in in response to his "chronic and progressive right shoulder pain." *Id.*, Exs. E–G at 38, 40, 46.

Thus, the Court continues to find that Plaintiff's allegations against Dr. Adam amount to no more than a mere difference of opinion between him and his doctor, as to the severity of his need and the appropriate course of medical intervention. *See Estelle*, 429 U.S. at 107 (noting that "the question whether an x-ray ... is indicated is a classic example of a matter for medical judgment," and that provider's failure to order "an x-ray or additional diagnostic techniques" does not constitute deliberate indifference); *Edmo*, 935 F.3d at 786 ("A difference of opinion between a physician and the prisoner—or between medical professionals—concerning what medical care is appropriate does not amount to deliberate indifference.") (citations omitted). To plead deliberate indifference, Plaintiff must allege facts which plausibly show that "the course of treatment [Dr. Adam] chose was medically unacceptable under the circumstances and that [she] chose this course in conscious disregard of an excessive risk to [his] health." *Id.* (citations omitted); *see also Nam Ba Nguyen v. California Prison Health Serv.*, No. 2:13-CV-963 MCE EFB P, 2017 WL 3208718, at *11 (E.D. Cal. July 28, 2017) (finding no deliberate indifference based on delay in the processing of prisoner's x-ray request). Here, Plaintiff fails to offer any "further factual enhancement" sufficient to show Dr. Adam's course of care was medically unacceptable under the circumstances, that the treatment options she chose evidenced any conscious disregard of excessive risk, or that any delay attributable to her in authorizing an MRI or recommending him for an orthopedic consult once he became her patient at PBSP, led to significant injury. *See Iqbal*, 556 U.S. at 678; *Hallett v. Morgan*, 296 F.3d 732, 746 (9th Cir. 2002) (deliberate indifference claim premised on delay of medical treatment must allege that the delay led to harm); *Rodriguez v. Palmero*, No. 1:14-CV-01742-BAM PC, 2017 WL 5564903, at *4 (E.D. Cal. Nov. 20, 2017) (finding prisoner with chronic shoulder pain's disagreement with doctor's diagnosis following review of x-rays insufficient to state a cognizable deliberate indifference claim).

For all these reasons, the Court finds Plaintiff's Amended Complaint still fails to state a plausible Eighth Amendment inadequate medical care claim against any

Defendant. *See* 28 U.S.C. § 1915(e)(2)(B)(ii), § 1915A(b)(1); *Watison*, 668 F.3d at 1112; *Wilhelm*, 680 F.3d at 1121.

    2.    *Unsafe Conditions of Confinement (Madden, Ramirez & Flores)*

With respect to Plaintiff's amended claims involving Defendants Madden, Ramirez, and Flores's however, the Court finds Plaintiff now alleges facts sufficient to plausibly show they acted with deliberate indifference a serious risk to his safety. *See* 28 U.S.C. §§ 1915(e)(2) and 1915A(b); *Wilhelm*, 680 F.3d at 1123; *Iqbal*, 556 U.S. at 678.

In his original Complaint, Plaintiff alleged only that a "disintegrating" ceiling "does not occur suddenly," that Madden, Ramirez, and Flores "should have been aware of the maintenance problems," and that they therefore failed to warn or protect him. *See* Compl., ECF No. 1 at 16–17 ¶ 31–32, 35. The Court found those conclusory allegations alone insufficient to show either that the ceiling's hazardous condition was objectively "grave enough" to pose an obvious risk of substantial harm to Plaintiff, *see Johnson v. Lewis*, 217 F.3d 726, 731 (9th Cir. 2006), *or* that Madden, Ramirez, or Flores acted with "a sufficiently culpable state of mind." *Id.* (citing *Wilson,* 501 U.S. at 298).

In his Amended Complaint, Plaintiff now contends Warden Madden was "well aware of a leak coming from the ceiling of C-Facility's visiting room," because an inmate visitor's committee reported "this and may other complaints and concerns" directly to him "at or around 30 days" before. *See* FAC at 14–15 ¶¶ 19–22. Plaintiff further claims Madden was physically present during a visitor's committee meeting and was "notified … of the leak in the ceiling and the continuing problems with the air conditioners in C-Facility['s] visiting room." *Id.* at 15, 17 ¶¶ 21, 32. Likewise, Plaintiff now also contends Ramirez and Flores "had been assigned to C-Facility visiting room for at least 90 days" before the ceiling collapsed, were fully aware the leak had developed, yet "waived it off as nonsense," and "declined to put [in] a maintenance work order to fix the leak." *Id.* at 16–17 ¶¶ 29–32.

Based on these amended allegations, the Court finds Plaintiff's FAC sufficient to plausibly allege that CEN Facility C's visiting room ceiling posed an objectively

12

substantial risk of serious danger to inmates seated beneath it, and that Defendants Madden, Ramirez, and Flores knowingly disregarded that risk. *See e.g., Helling v. McKinney,* 509 U.S. 25, 35 (1993) (finding that prisoner "state[d] a cause of action under the Eighth Amendment by alleging that petitioners ha[d], with deliberate indifference, exposed him to levels of ETS [Environmental Tobacco Smoke] that pose[d] an unreasonable risk of serious damage to his future health."); *Robinson v. Prunty*, 249 F.3d 862, 867 (9th Cir. 2001) (finding prison officials' alleged awareness of and indifference to a serious risk of frequent violent racial outbreaks, coupled by their alleged joking, and followed by a failure to intervene was sufficient to demonstrate deliberate indifference to inmate safety under the Eighth Amendment); *Frost v. Agnos*, 152 F.3d 1124, 1129 (9th Cir. 1998) (concluding that "[s]lippery floors without protective measures could create a sufficient danger to warrant relief" under the Eighth Amendment); *Hoptowit v. Spellman*, 753 F.2d 779, 784 (9th Cir. 1985) (finding that "safety hazards found throughout the penitentiary's occupational areas, exacerbated by the institution's inadequate lighting, seriously threaten[ed] the safety and security of inmates and create[d] an unconstitutional infliction of pain" under the Eighth Amendment).

Based on this precedent, and assuming Plaintiff's well-pleaded amended factual allegations true as it must at this stage of the proceedings, *Iqbal*, 556 U.S. at 679, the Court will direct the U.S. Marshal to effect service of summons with respect to Plaintiff's FAC upon Defendants Madden, Ramirez, and Flores.[5] *See* 28 U.S.C. § 1915(d) ("The officers of the court shall issue and serve all process, and perform all duties in [IFP] cases."); Fed. R. Civ. P. 4(c)(3) ("[T]he court may order that service be made by a United States marshal or deputy marshal ... if the plaintiff is authorized to proceed in forma pauperis under 28 U.S.C. § 1915.").

---

[5] Plaintiff is cautioned, however, that "the sua sponte screening and dismissal procedure is cumulative of, and not a substitute for, any subsequent Rule 12(b)(6) motion that [a defendant] may choose to bring." *Teahan v. Wilhelm*, 481 F. Supp. 2d 1115, 1119 (S.D. Cal. 2007).

### III. Conclusion and Orders

For all the reasons discussed, the Court:

1. **DISMISSES** Plaintiff's Eighth Amendment inadequate medical care claims against all Defendants based on his failure to state a claim against them sua sponte pursuant to 28 U.S.C. § 1915(e)(2) and § 1915A(b).

2. **DIRECTS** the Clerk to issue a summons as to Plaintiff's Amended Complaint (ECF No. 8) upon Defendants Madden, Ramirez, and Flores and forward it to Plaintiff along with a blank U.S. Marshal Form 285s for these Defendants only. In addition, the Clerk will provide Plaintiff with a certified copy of this Order, a certified copy of the Court's November 4, 2019 Order Granting IFP (ECF No. 5), his Amended Complaint (ECF No. 8), and a summons so that he may serve Defendants Madden, Ramirez, and Flores. Upon receipt of these materials, which comprise the "IFP Package," Plaintiff must complete the Form 285s provided by the Clerk as completely and accurately as possible, *include an address where Defendants Madden, Ramirez, and Flores may be served*, see S.D. Cal. CivLR 4.1.c, and return them to the United States Marshal according to the instructions the Clerk provides in the letter included in his IFP package.

3. **ORDERS** the U.S. Marshal to serve a copy of the Amended Complaint and summons upon Defendants Madden, Ramirez, and Flores as directed by Plaintiff on the completed USM Form 285s. All costs of that service will be advanced by the United States, *see* 28 U.S.C. § 1915(d); Fed. R. Civ. P. 4(c)(3), and proof of service, or proof of attempts at service unable to be executed, must be promptly filed with the Clerk of Court. *See* S.D. Cal. CivLR 5.2.

4. **ORDERS** Defendants Madden, Ramirez, and Flores once served, to reply to Plaintiff's Amended Complaint within the time provided by the applicable provisions of Federal Rule of Civil Procedure 12(a). *See* 42 U.S.C. § 1997e(g)(2) (while a defendant may occasionally be permitted to "waive the right to reply to any action brought by a prisoner confined in any jail, prison, or other correctional facility under section 1983,"

once the Court has conducted its sua sponte screening pursuant to 28 U.S.C. § 1915(e)(2) and § 1915A(b), and thus, has made a preliminary determination based on the face on the pleading alone that Plaintiff has a "reasonable opportunity to prevail on the merits," defendant is required to respond).

5. **ORDERS** Plaintiff, after service has been effected by the U.S. Marshal, to serve upon Defendants Madden, Ramirez, and Flores, or, if appearance has been entered by counsel, upon Defendants' counsel, a copy of every further pleading, motion, or other document submitted for the Court's consideration pursuant to Fed. R. Civ. P. 5(b). Plaintiff must include with every original document he seeks to file with the Clerk of the Court, a certificate stating the manner in which a true and correct copy of that document has been was served on the Defendants or their counsel, and the date of that service. *See* S.D. Cal. CivLR 5.2. Any document received by the Court which has not been properly filed with the Clerk, or which fails to include a Certificate of Service upon the Defendants, may be disregarded.

**IT IS SO ORDERED**.

Dated: May 26, 2020

*[signature]*

Hon. Larry Alan Burns
Chief United States District Judge